Thank you, Your Honors. May it please the Court, as this Court recognized in the prior appeal, a trial court abuses its discretion when it fails to consider and weigh all of the relevant evidence to a hypothetical negotiation. The trial court in this case made the same legal error in its five-page opinion that it did last time in its previous five-page opinion by constructing an unbalanced hypothetical negotiation that resulted in unreasonable compensation for the retained stance. Well, the one critical difference, it seems, is that, in terms of the argument you're making now, is that last time the trial court made it clear that it was considering the position from only one perspective. That was unequivocally clear in its decision, and that was an error because the hypothetical negotiation must be from both perspectives. This time you're saying it's inherent in their decision that they did that. However, the trial court did parrot the fact that he was considering the perspective from both sides. He said the right test this time. Last time he didn't even say the right test. This time he said the right test. But you're right. He gave them everything they wanted and took nothing that the government would have brought to the table in his ultimate decision, but he claims to have considered everything. That's a critical difference for an appellate court, isn't it? I think I disagree with that, Your Honor, because if you actually look at what the trial court said in its five-page opinion, when talking about the retained stance, there were really only two paragraphs where it discussed the factors that it considered in constructing its supposed hypothetical negotiation. It actually expressly says it considered all the evidence presented by both sides. There's a line in that opinion that expressly says that. It does say that, and it is near the beginning of the opinion, but if you look expressly at the section that talks about constructing the hypothetical negotiation for the retained stance, it discusses two factors, and then the court says, quote, for these reasons, and then he adopts, essentially, Gaylord's claim to a 10% royalty. No court, including ours, has ever said the failure to enunciate the facts on the other side is a basis for reversal in the absence of a clear indication that they weren't part of the process to be considered, and here, he said, I'm considering everything from both sides. He certainly knew the government's position because, gosh, he handled this case before, so this is not an unsophisticated trial judge who wasn't listening. He very well knew the government's position. He adopted it wholesale last time. This goes to the nature of a hypothetical negotiation, Your Honor. A hypothetical negotiation is not some sort of simple construct where one or two facts... Oh, there's nothing simple about a hypothetical negotiation. That's correct. I think this court had it absolutely right that the trial court needed to consider all of the relevant evidence, and here... And when we remanded it last time, to be clear, we told him expressly, even though it was a lump-sum fee, we're not precluding, and so he understood that. He did not accept from us a mandate that led him to conclude he was precluded from doing anything other than what he did because we put expressly in that opinion that he was still entitled to adopt a single lump-sum fee as the government proposed. It just was he had to consider it under the proper test from the vantage point of both sides. So I guess this is the problem I'm having is that your argument seems as though you're saying he made a legal error in the way he analyzed it. That's correct. And I just don't see any evidence of that in the opinion. You might have something on the idea that it was unreasonable where he went, but I don't see the legal error that you're alluding to. The legal error is that this court remanded and said that you have to consider all of the relevant evidence. He considered a small subset of the evidence and essentially... You just don't like the evidence he cited in the opinion, but he says he considered all of it, and you and I both know he was aware of it all because this was his second go-round on these damages. Last time in the previous case, he had said that he considered plaintiff's efforts to prove a reasonable royalty to be not credible, and one of the judges on the panel during the argument last time characterized that as a throwaway line. So it's... And I'm not going to characterize anything that... Was it me? No, Your Honor. Okay, I didn't remember. It was Judge Mayer, actually. All right. I didn't remember. I don't know if you were quoting me back to me, but... No, no, no. And my point is that he said that he was going to construct a hypothetical negotiation. He said in the previous opinion that he was constructing a willing buyer-willing seller analysis, but if you actually look at what he did, there's a host of relevant factors that he admitted into evidence that are in the record, many of which are unrebutted, and yet he failed to consider. This hypothetical negotiation... He failed to recite. We don't know that he failed to consider. Indeed, he said he considered everything. Right. In the very beginning of the opinion, he had that line, but then he said for these reasons... So your argument is that had he considered all the evidence, that damages would have been less than the 10 percent figure. That's your point, isn't it? That's one of my points, but I also believe that it's legal error for him to have to construct a hypothetical negotiation, and this is not an established royalty hypothetical negotiation or analysis, I should say. This is a hypothetical negotiation where you have to take consideration and weigh all of the relevant evidence, and there's at least seven sources of evidence which we identify in our brief that the trial court failed to consider, failed to mention... But again, he failed to mention. You don't know that he failed to consider them. In fact, they were part of his analysis last time around, and he claims he considered all of them this time. I think that you don't have a lot of time, and I would love for you to move where I think you've got a stronger argument, which is on the reasonableness of this in light of the record evidence. Would you mind switching your argument to that point? Certainly. Because I think both arguments are very similar in that there are at least seven different sources of evidence that the trial court didn't factor into his analysis, or at least unreasonably didn't weigh to change his opinion. This includes the Postal Service's stamp licenses. This includes Gaylord's very substantial incentive to enter into a hypothetical negotiation. It includes whether Gaylord's commercial merchandise agreements were actually comparable to the retained stamp negotiation that was taking place. It includes the government's expert evidence, which in many ways was unrebutted. The Postal Service's alternative, the industry standards... What alternative? That's the one failure in this record, it seems to me, on just that point. I'm not necessarily disagreeing with most of what you're saying, but it doesn't seem to me that the Postal Service proffered any evidence that they had any suitable alternative that would have allowed them to walk away from the deal were he to, at the table, demand a 10% royalty. What else could there be? If you really want to have a stamp that memorializes the Korean War, it's hard for me to even imagine what alternative would be more compelling. That is one of the most beautiful memorials on Washington and in Washington. So it's hard for me to imagine how the Postal Service could have found an alternative. I don't disagree with you that it's a beautiful memorial, but I think there's plenty of record evidence that the Postal Service has actually in the past gone out and sought out alternatives. But in this case, they wanted to commemorate the Korean War. They wanted to do that. What other... Is there anything in this record that says we could have alternatively commemorated the Korean War in the following ways? Yes, Your Honor. Post the construction of the memorial. I know that in 1985, the Postal Service did that, but that was before the memorial. And then the memorial is created and the whole public, particularly that part of the public that's seen it, views it as uniquely powerful in capturing this moment. That's correct, Your Honor. I was going to mention the 1985 22-cent stamp. And if you actually look at what that stamp looks like, that stamp has a column of soldiers marching with ponchos on. So it has many of the same thematic elements that are captured in the stamp. But specifically, with respect to this particular stamp, the government could have gone out and gotten rights to show other parts of the memorial. There's a mural wall. It seems to me the real alternative that the government had in this case is it could have just walked away. Well, for purposes of the hypothetical negotiation, you have to assume that the parties are willing. In terms of alternatives, the government could have just walked away. That's correct. And in the record, there is evidence, and one of our witnesses testified as to a situation where the Postal Service was doing a Legends of Hollywood series of stamps. Right. But there are 4,000 Hollywood people, and each one is, for Postal Service purposes, presumably as good as the next. There's one Korean war memorial. John Wayne? Really? You think there are 4,000 replacements for John Wayne? You get the point. There's only one. I do. Right. So can you fill in for me anything about the discussion within the, what is it, the advisory committee about what it is that led them to fasten on to using the memorial to celebrate the 50th anniversary of the armistice? Your Honor, I don't believe there was a lot of testimony about that, but it is clear that the Commission did consider a variety of other images. Of the memorial? Yes. Did they ever consider issuing this 50-year armistice anniversary stamp with an image other than of the memorial? Or was it perfectly clear that that's what they had to use because that was... I don't think the record is clear either way what the Commission thought, one way or the other. I think the record is clear, though, that the government makes money doing this. With respect to the retained stamp... Well, it's engaged in this thing of selling stamps, and from my own experience with Dutch collectors rush out to buy the first sheet of stamps and things of that nature, they make a pretty good profit on stamps that they sell but that are never used. And in this case, the record shows that the Postal Service made, what, $17 million from the sale of nearly 48 million stamps that bear the image that was created by this artist, and then that $5.4 million was derived from sales of stamps to collectors that were never used. The problem I'm having, you need to show me why half a million dollars in this case is not a reasonable damage award. Certainly, Your Honor. With respect to your point about the profits, I think we could all agree that the Postal Service is not a profitable entity of the federal government. But even with respect to the stamp that was... And it'd be even less so if it walked away from opportunities like this, wouldn't it? Well, every stamp that it issues has retention, and so therefore, every stamp is profitable in this narrow sense that we're taking a look at it. So the question isn't really... But wait, the record in this case reflects the fact that the Postal Service believed when they were issuing the stamp that it was going to be wildly successful, and they issued 80,000... Oh, 80 million? What was it? I don't remember. It was 86.8 million. Million. That's correct. Which is almost twice the normal run for stamps that they believe will be collectible stamps. And so the record reflects that the Postal Service, at the outset, before issuing the stamp, harbored a belief that this stamp was going to be significantly more successful than their average commemorative stamp. Not their average stamp, but their average commemorative stamp. So why wouldn't they have walked into that hypothetical negotiation more willing to deal? Your Honor, I think one thing that we cited as part of our supplemental citation was the Oracle case, and one of the principles in that Oracle versus SAP case is that the amount of the infringement doesn't necessarily tell you what its value is. And with respect to your point as far as the amount of stamps printed, the record testimony was that that amount of stamps was printed because of its theme, largely. It's not driven by the image. Same thing with the profits as well, too. It's not driven by the image. It's driven because it's a stamp. I'm sorry. I gather that the evidence is, and we talked about this a couple of minutes ago, there's going to be a stamp for the 50th anniversary of the armistice ending the Korean War. Apparently, immediately, the relevant commission decided the memorial is going to be on that stamp. For reasons that are so readily imaginable, I understand why there's no contrary evidence. The wall is not what makes that memorial uniquely memorable. It's the sculpture. So at that point, there's this giant profit-making opportunity sitting there for the Postal Service in which they cannot effectively walk away, and they get to keep 90% of the profits. How is this unreasonable? I disagree with the characterization, Your Honor. The Postal Service is not in the business of taking people's images and trying to make profits off those images. What the Postal Service does is it tries to honor and commemorate important things in American history, such as the 50th anniversary of the armistice of the Korean War, or Spencer Tracy's stamp law, the legend of Hollywood. The reason I bring this up is because when the Postal Service can't get all the rights from a claimed rights holder, like the person who claimed they owned 50% of the Spencer Tracy stamp, I assume that the commission decided at some point that they would like to get the Spencer Tracy stamp. But when they couldn't come to a reasonable negotiation with the rights holders, they had alternatives. They turned to John Wayne. But why is this not a reasonable negotiation for something that I assume that there was a very strong interest on the part of the Postal Service in doing, because of the event, because of the unique way of memorializing that event. And at that point, they also happen to have one of their rare profit-making opportunities, and they get to keep 90% of it. Your Honor, the Postal Service would have gotten to keep these so-called profits with respect to whatever image was put on the stamp. But yes, I do agree that they probably wanted to commemorate the 50th anniversary. So I think what you have to look at is the trial court should have factored these things into the Postal Service's incentives, but it should have also looked at what Gaylord's very, very substantial incentives were in negotiating with the Postal Service. Well, as I understand it, he had, I think based on experience, essentially no other meaningful monetizing opportunities that would be benefited as a byproduct of the massive increased publicity of the stamp, which lots and lots of other work suppliers to the Post Office do have. The publicity helps them in selling their other products. He had tried this, and the stamp was basically it. So he doesn't have a big opportunity cost that he is passing by, and he has something of unique value to the Postal Service. Again, how does that basic dynamic of the negotiation make a 90-10 split unreasonable? I think it's unreasonable because, once again, you go into the hypothetical negotiation, and his starting position for negotiation is, I've got 10 percent on a license agreement for merchandise, and the Postal Service says, that's great. Well, we've negotiated with very sophisticated entities, zero to $5,000 lump sum payments for rights to use the image on a stamp. They could have both gotten what they wanted out of the hypothetical negotiation. In fact, the government has stipulated that he should receive 10 percent of the merchandise that the government sold with the image on the stamp, and the Postal Service could have gotten what it wanted, but you have to look at the objective evidence. But the profit-making opportunity and, indeed, the public commemoration opportunity for the Postal Service doesn't lie in the merchandise as a dollar matter. It lies in the stamps. There was, what, $33,000 or something of merchandise? That's correct. Trivial compared to the stamp revenues. That's where the money was, and that's where the Postal Service's interest. But, again, it's not his image. There's no evidence that it was his image that was driving this profit of the stamp. People collect stamps no matter what the image is on there. And, in fact, over the course of the year, many people who initially collect the stamp will just put it back on an envelope and then send it in the mail and use it. So, really, you have to look at what the incremental value of people collecting the stamp, how that drove any of this profit analysis. I see that I'm in my rebuttal time now. We'll restore your entire five minutes. Thank you. We'll hear from Ms. Harvey. To directly address within the record about alternatives, it's not cited in the appendix because the government only made the argument that they could have photographed another component of the memorial as an alternative in their reply brief. So they said that in their reply brief at page 16 to 17. But in the trial record at page 5 of the first trial in 2008, 579 to 80, Mr. McCaffrey, who was the creative director, testified that the Postal Service looked at, quote, five or six different photos of the memorial at different times of year by the same photographer. And then the testimony of John Ali, which was quoted in the court's first opinion in 2010 on fair use, made it clear that Mr. Ali had taken five or six photographs, had taken photographs at different times of year of the column. So the testimony that's in the record is that the only photos that the post office considered were photographs of the column component of the memorial. And beyond being a stamp... What is the evidence in the record that Mr. Gaylord, that 10% was a reasonable royalty? The evidence in the record are Mr. Gaylord's own prior licenses for the work. What prior licenses? Because there was one, but it's really effectively an 8% license, right? It's this strange license where it's a 10% royalty with a 20% kickback on the royalties. I mean, it's very strange. I don't know why somebody would write it that way, but it's 8%. The 20% that came back was to fund the Korean War Veterans Memorial Foundation, which is charged with maintenance of the memorial. And so all of the parties who were licensing rights agreed to contribute a portion of their royalties to fund the maintenance. But under those circumstances, Mr. Gaylord only received 8% because 20% of his 10% royalty went to this charitable organization of his choosing. So it would be like anybody else who earned a royalty income and then at the end of the supported. Yes, effectively their income is reduced by that amount, but a third party out in the world paid 10% to the entities that were licensing. And so the fact that those three licensors then agreed among themselves that to maintain the memorial, they would voluntarily contribute a portion of it to the foundation has really no bearing on the fact that a third party at arm's length was willing to pay 10%. What about the idea? So Mr. Gaylord had a royalty 10%, and what did he earn about? Was it $30,000 or something? He received a $16,000 upfront payment before the license was ever even in effect to enter into the agreement, which is something I'd point out to say that the position of the Postal Service that a $5,000 or $10,000 starting point here, given the profitability of the stamp, is really a non-starter in terms of- But Mr. Gaylord didn't know the profitability of the stamp. The profitability of the stamp is an ex-post thing, right? We didn't know, and certainly Mr. Gaylord didn't know, that the Postal Service stood to earn $5 million in profit from collector stamps. Mr. Gaylord wouldn't have come to the negotiating table with that information. A hypothetical negotiation does not involve both parties having perfect information. It involves both parties coming with their own personal baggage to the table, right? Mr. Gaylord wouldn't know, but the Postal Service would. The Postal Service would know that the- Okay, ma'am. So the Postal Service would be willing to give him maybe more than their standard amount, but why would they give him the most he's ever gotten in any set of circumstances, which is 10%, which only amounted to $16,000, if the Postal Service is coming to the table with the belief that they're going to have $5 million in profit, absolutely. It would motivate them to give him more than $5,000, but it certainly wouldn't necessarily mean that he would come to the table expecting to get his full 10%. Well, this court said in its remand opinion that Mr. Gaylord had consistently licensed his work for 10%, and those licenses of the intellectual property that's at issue are some of the most pertinent licenses. Were there more than just the one? There was a license calculated in the same way the Court of Federal Claims actually calculated this damage award. After the fact that somebody having sold a reproduction, Mr. Gaylord said, you know, you need my permission, and I charged 10% of the price. But that's after. That's a post-litigation. No, it's not post-litigation. Oh, no? No, it is before the hypothetical negotiation, and there was no litigation. They just became aware that somebody was reproducing it and said, you know, we own those rights. You have to pay us. And did they pay 10% or is that the one? I remember there was one where he said you're going to have to pay 10% and he threatened to file a lawsuit or something, and then he walked away and let them have a free of charge, royalty-free license. Isn't that right? Am I remembering it right? No, there's nothing in the record about that. There is a post-litigation or contemporaneous with litigation license with Mr. Ali, the photographer, in which Mr. Ali has agreed to pay Frank Gaylord 10% of his revenues. He received permission to sell his photo, and he will pay Mr. Gaylord 10% going forward, but that was contemporaneous with the filing of this lawsuit. So we're looking at these licenses with third parties, but what about a license with the Postal Service? I mean, they seem to have a pretty set history as to how much they're willing to pay. Right. Comparability of licenses under the hypothetical negotiation requires comparability, not identity. And it's clear the Postal Service has never, ever agreed to pay royalty on stamps. So there will be no such licenses. Of running royalty. On stamp revenue. They've never— Per unit running royalty. Yes, never. A lump sum is still a royalty. A lump sum is still a royalty, but there are no running royalty licenses. So requiring that would be an impossibility. And as to the lump sum licenses, because the Postal Service has a monopoly on stamps, they basically present a take-it-or-leave-it posture to the public. And in fact, this Court, in remanding— But if that's true, then why would a 10% running royalty be a reasonable royalty in a hypothetical negotiation under these circumstances? Well, for instance, in the Oracle case, which the government just cited, they said licenses that were in the market before the infringement commenced are relevant to the hypothetical negotiation. Yes, but the licenses, as Shoshana said, on both sides. The Postal Service's licenses were, we've never paid more than a single lump sum of $5,000 for these rights. Your licenses are, we get 10%, as much as $16,000 sometimes. I don't understand why there wouldn't have been some—why the only reasonable response is that a hypothetical negotiation would have resulted in some meeting in the middle. Because this hypothetical negotiation has to compensate Mr. Gaylord for the use of the infringing image on stamps. They were printed and ready to go on the date of the hypothetical negotiation, which was the date of the stamp release. And every other lump sum that the Postal Service ever issued doesn't include anything about any royalty on the stamp. Did those lump sum—is the history of the lump sum payments by the Postal Service, how many of those included an infringement situation? None of them were infringement situations. No, but they weren't infringement situations because they were negotiated in advance of infringement, right? But they were, yes. They would have been infringement. They would have been. But they also were all only for rights to the photograph of the underlying work. So all of those lump sum licenses, which I think the Court was well within its discretion to discredit based on the Postal Service's take-it-or-leave-it posture, this Court said in remanding, defendants cannot insulate themselves from paying damages—for the damages they caused by resting on their past agreements and by creating internal policies that shield them from paying fair market value for what they took. Those lump sum licenses do not represent any true economic arms-length negotiation because the Postal Service will say, if you won't accept $5,000 or less, your image won't be on a stamp. And some people have walked away from that. Mr. Gaylord didn't get that opportunity. But more importantly, they included additional elements, such as attribution, which Mr. Gaylord did not get, and I think— Sorry, what does that mean? That means that they credited the author of the work for being the author of the work. And Mr. Gaylord is totally anonymous in connection with the Postal Service's release of this stamp. But I think the most important comparability point about the lump sums is that they're solely for the photo and not for the underlying work. Every single one of them, by their terms, says it's for the photo. That makes them analogous to the license that Mr. Ali, the photographer, got because he was able to give the rights in his photo but not the rights in the underlying work. And indeed, that's one of the licenses they're relying on as comparable lump sum licenses. But all of these arguments may well have moved the reasonable royalty in the hypothetical negotiation quite a bit above the $5,000 largest amount the Postal Service has ever paid before. But why does that move it all the way to the most Mr. Gaylord has ever gotten before? It seems to me there was no reduction in light of the government position. The hypothetical negotiation, you would think, is a negotiation, right? I mean, it's got to hurt a little bit on both sides. What hurt Mr. Gaylord? Where did he give anything at all in this process? He gave up on the stamps that were used for mails completely. There were $30 million in sales. And he conceded that because stamps were used for mails and the consumer decision in terms of buying those stamps is difficult to parse out why they purchased it. He forwent $2.5 million of additional damages that he could have asked for. In addition, he didn't ask for a royalty in the hypothetical negotiation that exceeded the royalty he had typically used. Would it also be an answer that says, look, this is a unique circumstance for both parties? The Postal Service has this unique potential money-making opportunity under a constraint that says it sort of has to do this. He had never before had any pot of money that he was looking at. So maybe he could have walked into the negotiation and said, I think 20% is pretty reasonable. Well, typically, the determined royalty in the litigation will be higher than the going rates in the marketplace. We didn't ask for that. We didn't ask to extrapolate. What do you mean typically? Hypothetical negotiation, I don't see very many cases where hypothetical negotiation results in a license that is considerably more than the going rate in the marketplace. In fact, isn't it supposed to effectuate? I mean, I don't understand there to be a punitive aspect to damages in these scenarios. No, most of the cases don't manage to establish a going rate. In fact, it would be punitive if they did do what you're suggesting, and that would be contrary to the law. I'm not suggesting anything punitive. I'm suggesting experts typically will look at existing licenses that may or may not be comparable, take the rates, and then reach a conclusion that the rates should be higher. And litigation-determined rates have often been higher than some of the rates that appear in comparable agreements. In addition, the Postal Service rested on the lump sum agreements and did not present any evidence, alternative evidence, of what a royalty would be. But is there evidence? One of the other things that makes this kind of complicated for me is how is the Postal Service supposed to even deal with a running royalty? It just so happens in this case. We know that the damage base is about 5.4 million. I mean, they argue the damage is base and say it should have been reduced, and I understand their argument. But how would the Postal Service, in a normal scenario, be able to effectuate payment on such a royalty? Because there usually isn't a tracking of exactly how many stamps are sold for collectors. We only happen to have the luxury in this case of this being among the group of stamps that was actually selected out for a special study that they did when they took data. But that's not part of their normal process. I've never walked into the post office and been asked whether I'm a collector and am I buying this stamp for collectible purposes, or do I intend to use it on mail? How would they know? The study that has the data, PX-29, the Sinovac survey, was not a one-time study. It was done... No, but it's not done for every stamp. It's done for every commemorative stamp. Oh, it is done for every... And if you look at page of JA-1235, you see the longitudinal trends of stamp retention, JA-1235, that very study has four years worth of stamp acquisition and stamp retention data, and they did this every quarter for every commemorative stamp. I didn't know that. Okay. They had done it for four years before our stamp. They continue to do it after our stamp. So the Postal Service and Mr. Gaylord both have a statistically valid study done by a third party. Nobody can juice the numbers. And it's a reasonable... And it's an estimate of the retention rate, but it's a reasonable compromise between guessing... But isn't it the estimate of the retention rate at what point in time? How many months or years out? The study is done three months after the stamp is issued, in the quarter after the stamp is issued on the assumption that most of the stamp sales occur right when the stamp is issued. That is always what's done. So it is an estimate... I guess, why isn't there something to the Postal Service's argument that this royalty base of 5.4 million isn't fair because it's looking at unused stamps at the three-month point? Like me, I buy stamps in a roll of 100. Do you know how long it takes me to use 100 stamps? Certainly longer than three months. I'm not retaining the others because I'm some sort of collector.  I just don't use them as quickly. And so why wouldn't there be a clearly anticipatable reduction from that $5.4 million at the six-month point or the one-year point when the rest of the stamps get used? For two reasons. First of all, the study specifically asked people which stamps they intended to retain and never use. That's the data point that's in each of these quarterly studies. And second, we showed by cross-examining the Vice President of Finance for the Postal Service that they don't create any charge for the future liability of stamps against any commemorative stamp. They treat every commemorative stamp of current revenue in the term that it's sold. They only create a small 2% reserve of future postal liability across all stamps, including one-cent stamps and special issue stamps and workhorse stamps like the Liberty Bell stamps that people buy in rolls of 100. And so the $5.4 million taken at a three-month snapshot is a... We don't know. Maybe more were retained. Maybe Mr. Gaylord was the person who gave up something. But it's a reasonable compromise because based on a third-party statistically valid survey, both parties could reasonably rely upon that in a hypothetical negotiation as a reasonable compromise on the risk of having to track the difficulty of tracking and Mr. Gaylord having to wait for the entire life of the stamp to receive any payment. And because it was calculated that way, I think that the Court was well within its discretion in relying on it. We're restoring Mr. Bolden's rebuttal time. So I see you packing up. If you don't feel you have anything further to say, that is fine. You don't lose points for giving up time. But if you want a little more time, if there's anything you feel like you need to address. Well, the only other thing I was going to address is the point about the entire market value rule theory that's in their brief, which I think does not apply to this case. And the cases that they cite that seem to give support to that are cases of indirect damages under copyright. So for instance, the Oracle case they cited was downloading of software. But the damages were trying to be calculated based on the number of customers that would be converted. So there was a copyright infringement. But there was not a saleable article that bore the copyrighted image where the revenue from that sale was directly connected to the copyright image. And even Georgia Pacific says where the entity that's being sold is a unitary article that's coextensive with the intellectual property. No apportionment is necessary. And so I think that goes a long way to these crazy comparisons of did it do better or did it do worse. No one would tell Walt Disney that because some other t-shirt with Harry Potter on it that Disney doesn't get a royalty on every t-shirt that had the infringing Disney character on it. Harry Potter? Yeah. Oh, you mean as a comparison to a Disney character? As a comparison. No one would say to Disney, you have to do better than the other shirts we sell before we owe you for each t-shirt that we sell. So here where we have an item that is the saleable unit, direct one-one relationship to the revenue. Has that, by the way, I was looking a little bit and was not able to find. Has that particular, on that point, has that particular issue been litigated in copyright cases where a movie theater shows a movie and says in response to, obviously the infringement can be stopped, but says in response to a backward looking monetary remedy question, I could have shown Casablanca instead and still filled the house. Right. So that comes up in indirect damages cases in copyright where, say, a musical composition is played at a- It may have been well had you not gotten into this. We sat down when we could because the Supreme Court has addressed this instance in Sheldon versus Metro Golden Mirror. And it said that we find that the analogy found in cases of patent infringement is persuasive. There are many cases where the plaintiff's patent covers only part of a machine. It creates only part of the profits and goes on to limit damages to that part that's covered by the copyright only. Right. And in this instance, you have a picture. You have perhaps advertisement that was made by the post office. And so there's the potential here that damages should have been limited only to that that was accounted for by the column, the artist's work. And I don't see that evidence in the record. So I disagree with that characterization. Are you familiar with Sheldon? Yes, I am. And Frank Music, Polar Bear, and Oracle are all indirect damages cases that flow from Sheldon. In those cases, what was sold was not an item that bore the copyrighted image. What was sold was bar receipts from a hotel restaurant that played an infringing song. And Georgia-Pacific itself, the actual Georgia-Pacific case says, where the item is unitary and it's a saleable unit and it's coextensive with intellectual property, no separation is required. And so this is not that kind of case. This is just not a proper case for EMBR. Maybe a software copyright where there were multiple components with multiple functionality and the copyrighted software went to one portion of the functioning software and it was the software that was licensed. Then you would have to- Don't we have that here? Mr. Ali has a copyright too. So don't we have a little bit of a sharing scenario here? You can always parse down to the atomic or subatomic level that things are made up of components. But what I'm saying is these- I mean, this is pretty simple. I mean, there's two copyrights in play here. Mr. Ali has been paid for his copyrighted work and Mr. Gaylord has not been paid. Why shouldn't we hold Mr. Gaylord responsible to damages that are limited, that are counted only by his copyright portion of the work? How do we know, for example, that the picture itself is what drove consumer demand here and not the underlying work? Those arguments have lots of traction in patent cases which have functional items with multiple functions and multiple components. They don't really have applicability to a case where you have a visual, artistic, totally ornamental, and non-functional copyrighted work that is applied to something. You don't make Walt Disney prove that person didn't buy it because of the Disney character, they needed a t-shirt. That is not the analysis in copyright law for this type of case where there's a one-to-one correspondence between the work being sold, the revenue stream, and the work is applied to the article being sold. And you have authority that stands exactly for that proposition? My authority is that Sheldon and Oracle and Frank Music and all the cases that are parsing are parsing cases of indirect damages. And if you look at them, you will see there is nothing being sold that is generating revenue that is burying the copyright image. Whereas in Oracle, in the cases they're distinguishing, like Jarvis, the licensed software was sold for a couple hundred dollars a seat, or wall data, I'm sorry, I meant to say wall data, the police department installed in 6,000 seat licenses. So you want to distinguish this, these cases based on the article itself, whether it's a t-shirt, a movie picture. That's not the point, is it? The point is that you have an article that has multiple copyrights or multiple patents in it. And here, and that's what happened in Sheldon. Here in this case, you have an image, a stamp, that contains at least two copyrights in there. Yeah, it does. But that's why Mr. Gaylord gets 10% and not 60%. You have to leave space for them to negotiate the other rights that they need. But I think if you look at all of those cases which seem to be parsing out the components in a copyright context, the answer is there is nothing being sold in those cases that bear the... Maybe the answer is that we get what was paid to the photographer, which we know what was paid to him, and subtract that from, which I think has already been done, right? Subtract that from the amount of damages to Gaylord. Mr. Gaylord would not be upset if that were the end result. Right. I think you ought to... Theoretically... Because we're talking about $1,600. Theoretically... That covers your dilemma, I think. But I just don't think it's a legal matter that the EMVR applies to this kind of case. And I think if you look at all the copyright cases, you will see they have a distinctly different... They're measuring a revenue stream that is not related in any direct way to the copyright. Okay, Ms. Harvey, I think we need to hear from Mr. Bolden and move on. Mr. Bolden? Is this a little time? Sure. Thank you, Your Honors. Addressing the entire market value rule first, the Postal Service was not out there selling miniature replicas of the column. Essentially, it was selling a stamp. That stamp was... Actually, that's not true, because you also had the work, right? You were selling T-shirts and other stuff. So you basically were out there selling those replicas of the column. Yes, but even that... It wasn't just... It was not just the stamp. Even that image, that stamp was a collection of different contributions from people. It was a collection of John Ali's contributions, and it was a collection of the Postal Service's contributions in, quote, posterizing the stamp and washing out the colors from what John Ali had done. But in addition, I also want to mention that some of Gaylord's past agreements also showed that he recognized that in cases he needed to split his royalties when other people had contributed valuable things. If you look at the first royalty... In this case, Mr. Ali was paid. Yes. Correct? Yes, he was paid. He negotiated... Even if we go down the road of the entire market value scenario, we know the value of at least one of the copyrights. What is that, $1,600 or something like that? It's not much. Well, Your Honor, if you only look at the financial amount, I don't think that captures what the true value of having your work on a stamp really is. There's certainly a nominal payment, a lump sum royalty. But even very sophisticated entities like Disney often waive that because of the immense value that they receive. Because they have vast byproduct monetizing opportunities. And I thought the one thing this record made perfectly clear, that try as he might, Gaylord couldn't get any of those. Gaylord admitted that after the stamp came out, it actually increased the value of his work. He could have exploited those opportunities. And as the plaintiff, it was his burden to put forth evidence that there was objective fair market value. The fact that he didn't exploit the increased value of his work. We can't hold him responsible for that in the damages calculation, can we? No. But you can't also accuse the Postal Service of... With the Postal Service, you have $17 million in profits. No, no, no. I'm sorry. That's how much we admit for sales? Correct. At that time, the Postal Service was under a break-even requirement where if you sold a $0.37 stamp, you had to provide $0.37 worth of services. So with respect to that $17 million, that was our revenue. I know this is not relevant. Is it still break-even? No. I believe in 2006, they changed it. And in fact, that's why they've had very big losses ever since then. Something else I want to mention as well too, with respect to the surveys that we talked about, yes, I agree. Ms. Harvey was correct. The Postal Service does do these surveys for practically every commemorative stamp. But these surveys, it's important to recognize exactly what they measure. They measure the retention after three months. That includes everybody who goes out and buys 100 copies of a particular stamp just to save them. Later, the Postal Service found out that and tried to convert these numbers so that they could use these for their financial statements, that the real value of retention is really taking a look after 12 months because the collectors are still going to have the stamps primarily after 12 months. And in fact, if you look at the Oracle case, there's helpful commentary in that case as well too because they say, yes, you've provided some evidence, which is relevant, of the financial projections of SAP. But those financial projections have various forms. Now, I find that persuasive with respect to individuals that go out and purchase stamps. But there is this industry out there of people who do go out immediately upon the issuance of a stamp, whether it's this commemorative stamp or even duck stamps, correct? Even the duck stamps. It's people that rush out that day and buy those stamps. And that's part of the business that the Post Office is engaged in. Yes, that's correct, Your Honor. And I think that's true, like you say, for every stamp. And so you have to look- But with the duck stamps, for example, you do go out and get a copyright agreement with the artist. That's my understanding. I'm not all that familiar with the duck stamps, but we do always try to get the rights from the photographers and any other rights holders that might have a claim to the particular image. Here, we just messed up, essentially. We certainly got the rights from the photographer. We thought we had the rights to a national monument built on the National Mall that Mr. Gaylord constructed for three quarters of a million dollars. So something else I want to mention as well, too, is the prior licenses or the prior license. You spoke about the World Travel License. And I'm sorry, I'll try to quickly wrap this up. There was a $16,000 lump sum. That wasn't part of that actual agreement. He actually only earned about $2,500 in royalties. And so for these reasons, Your Honors, we request that this be remanded for a full consideration of all the relevant factors. Thank you. I thank both counsel. The case is taken under submission. I just want to say I really appreciate the level of sophistication of the argument and the detailed understanding you both had of the factual record. It was very helpful to the court.